OPINION OF THE COURT
Charles H. Solomon, J.
Defendant is charged with murder in the second degree (Penal Law § 125.25 [1]). He allegedly shot his father, Jose Cortijo, to death at his place of employment in Manhattan. The shooting occurred on December 12, 1977. Defendant was not a primary suspect in the homicide until almost 18 years later, when he stated to a New York City probation officer during a presentence interview that he killed his father. This interview was being conducted after defendant was convicted of a narcotics-related felony in New York County Supreme Court. These statements, as well as two subsequent statements made *180 to police detectives, are the subject of the instant motion to suppress. A hearing was held before me on defendant’s motion. At that hearing, the People called Probation Officer Urania Vullo and Detectives Frank Colaianni and Dan Danaher. Defendant did not present any witnesses at the hearing. In an oral ruling delivered from the Bench, defendant’s motion was denied in its entirety.
Findings of Fact
Based upon the credible evidence adduced at the hearing, my findings of fact are as follows. Probation Officer Urania Vullo, a 10-year veteran of the New York City Probation Department, has been assigned for the last six years to the Investigations Unit. The function of that Unit is to prepare presentence reports. These reports are used to assist the court in determining the appropriate sentence a defendant should receive after that defendant has either entered a guilty plea or been convicted after trial. Defendants are routinely interviewed for the purpose of preparing the report and the defendant’s statements are thereafter made part of the presentence report. Probation Officer Vullo has interviewed approximately 1,800 defendants in connection with her preparation of presentence reports. She testified that when conducting a presentence interview, she regularly follows the standard procedure set forth in a booklet issued by the Probation Department. Generally, a defendant is asked for a statement concerning the offense of which he stands convicted. Defendant is also questioned about his social history, educational background, and physical and mental health history. Defendants are not asked to comment on any open cases, which are not the subject of the conviction.
In April 1995, Officer Vullo was assigned to conduct a presentence interview of the defendant in connection with a conviction, after a jury trial, for a narcotics-related offense. Because of that, on April 11, 1995, she met with defendant, who was in custody, at 100 Centre Street, in an area commonly referred to as “the pens”. Vullo introduced herself to the defendant and explained the purpose of the interview. She had never met the defendant prior to that date. She told the defendant that she would be asking him many questions and that he was free to refuse to answer those that he did not wish to answer. Defendant was also told that his statements would be made part of the presentence report. Defendant was not read his Miranda warnings by Officer Vullo, as it is not the practice of *181 probation officers to advise defendants of their constitutional rights prior to a presentence interview.
Officer Vullo testified that the defendant was very anxious to talk about his drug conviction and initially made a statement with regard to that offense. Vullo then asked the defendant various pedigree questions, including his date of birth and where he resided. Defendant stated that he had been homeless since his father died in 1977. Vullo then asked him questions about his social history and, specifically, about his family. He was asked where he was born and raised. He was then asked about his siblings, followed by questions about his mother. Defendant was then asked, “Where’s your father?” Defendant, looking at Vullo angrily, stated, “I killed my father.” Vullo, thinking she might not have heard defendant correctly, then said, “What?” Defendant repeated, “I killed my father.” Defendant then said, “No, I didn’t kill him, somebody else did.” Vullo asked defendant what happened to that person, and he responded, “I don’t know” and then stated, “No, I killed my father.” Vullo did not ask the defendant for any details, nor did he provide her with any. Rather, Vullo continued with the interview according to standard Probation Department procedure, and completed a presentence report. Defendant was asked about his psychiatric history during the interview. He stated that he was currently taking Navane, a prescription medication and that he had a history of psychiatric problems. Prior to the interview, Vullo had no information regarding the defendant’s father, including whether or not he was alive. Vullo later told her supervisor as well as an Assistant District Attorney about the defendant’s admissions.
Detective Frank Colaianni, a 30-year veteran of the New York City Police Department, testified that on October 12, 1995, he, Detective Newham and Sergeant Casey travelled to Fishkill Correctional Facility to speak to the defendant regarding his father’s death. The defendant, who was an inmate at that facility, was brought into a room where the detectives were waiting for him. Detective Colaianni introduced himself and told the defendant that they were investigating his father’s murder. After they all sat down, the defendant blurted out, “I hear voices. I hear a bang. I shot my father.” This statement was not made in response to any questioning by the detectives. After the defendant made the statement, Detective Newham read him his Miranda warnings from a preprinted form. Defendant indicated that he understood his rights and agreed to speak to the detectives. Both Detective Newham and the de *182 fendant signed and dated the form. At no time did the defendant indicate that he wanted to speak to a lawyer. The defendant then stated, “I was on the train that day.” The defendant then told the detectives that he wanted to go back to his cell. A correction officer was summoned and the defendant was taken back to his cell. The detectives then left the facility.
Two and a half years later, on April 2, 1998, Detective Daniel Danaher, a 13-year veteran of the New York City Police Department, and Detective Neil Carter went to Sing Sing Correctional Facility for the purpose of interviewing the defendant in relation to the murder of his father. Detective Danaher was aware of the earlier attempt by other detectives to question defendant. He was also aware of the statements defendant made to Probation Officer Vullo. The defendant, then an inmate at Sing Sing, was produced in an interview room where the detectives were waiting for him. Detective Danaher introduced himself and Detective Carter. He then told the defendant that they were there to ask him a few questions, but first they wanted to advise him of his Miranda rights. Detective Dana-her advised the defendant of his rights from a preprinted Miranda warnings sheet, which he and defendant both signed. The defendant indicated that he understood his rights and said that he was willing to talk to the detectives. No promises or threats were made to the defendant by either detective. At no time did defendant ask for an attorney. Detective Danaher was unaware of defendant’s psychiatric history or whether he was taking any medications at the time of the interview.
After he was advised of his rights, Detective Danaher asked defendant why he killed his father in 1977. The defendant responded, “So what? I killed him.” Detective Danaher testified that the defendant then said, essentially, “Why are you guys breaking my balls? You’re the second guys that come up here to break my balls. If you take me to court, I’ll tell them the same thing.” The defendant then told the detectives to “go fuck” themselves, and reiterated that he killed his father. Detective Danaher asked why, to which the defendant replied, “Because I felt like it.” The defendant then stood up and said he wanted to leave the room. A correction officer was summoned and the defendant was escorted back to his cell. The whole interview lasted approximately five to seven minutes.
The defendant seeks suppression of the statements he made to Probation Officer Vullo during the presentence interview, as well as the statements he made on October 12, 1995, and April 2, 1998, to the detectives.
*183 Conclusions of Law
The first issue to be decided is whether a probation officer conducting an interview of a defendant for purposes of preparing a presentence report is required to advise that defendant of his Miranda rights before speaking with him. Defendant’s primary argument in support of his motion is that the failure of Officer Vullo to advise him of his constitutional rights requires suppression of the statements he made to her. While neither the intermediate appellate courts of this State nor the Court of Appeals have ruled on this issue, the Federal courts have routinely held that Miranda warnings are not required to be given in these circumstances. And, while those decisions are not controlling, they do provide a strong basis for denying suppression.
It is conceded by both sides that the defendant was in custody when interviewed by the probation officer. It is also not in dispute that defendant was not advised of his Miranda warnings prior to the presentence interview.
The Supreme Court’s ruling in Miranda v Arizona (384 US 436 [1966]), and its progeny, were designed to preserve an individual’s right against self-incrimination during an “incommunicado interrogation * * * in a police-dominated atmosphere”. (Supra, at 445.) The “extraordinary safeguard [of Miranda] ‘does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.’ ” (Minnesota v Murphy, 465 US 420, 430 [1984], quoting Roberts v United States, 445 US 552, 560; United States v Washington, 431 US 181, 187; see, People v Ronald W., 24 NY2d 732, 734 [1969]; cf., People v English, 73 NY2d 20, 23 [1989].) The question becomes whether a presentence interview creates the type of inherently coercive environment giving rise to the protections of Miranda. Stated another way, does a presentence interview by a probation officer constitute the type of custodial interrogation requiring Miranda warnings? A review of the purpose of the interview, the role of the probation officer, the amount of control exerted by the defendant during the interview, and the actual interview itself in this case, compels a finding that Miranda warnings are not required in this setting.
To begin with, the purpose of a presentence report is to provide the court with information relevant to sentencing a defendant. It is required that the report include information on the defendant’s education, family background, social history, employment record, and criminal history. (CPL 390.30 [1].) *184 Referring to these reports, the Court of Appeals has stated, “[t]heir main function is to provide the court with the best available information upon which to render an individualized sentence.” (People v Perry, 36 NY2d 114, 120 [1975].) Indeed, the information conveyed in the presentence report is deemed so critical to the sentencing process that, by statute, the court cannot proceed without it, except in very limited circumstances not relevant here. (CPL 390.20 [4]; Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 390.20, at 218.) The report is a neutral rendition of facts relevant to the court’s sentencing responsibility. (People v Perry, supra, at 120; People v Peace, 18 NY2d 230, 236 [1966], cert denied 385 US 1032.) It is, in part, because of this that the protections of Miranda should not apply.
. Moreover, in compiling this information for the court, the probation officer does not act as an adversary of the defendant. {People v Peace, supra, at 236.) Instead, the probation officer functions as what the Federal courts have characterized as a “ ‘neutral information gatherer’ ” for the court. (See, United States v Cortes, 922 F2d 123, 126 [2d Cir 1990]; Williams v Chrans, 945 F2d 926, 951 [7th Cir 1991], cert denied 505 US 1208; Agudelo v United States, 724 F Supp 1110, 1111 [ED NY 1989].) As stated in Agudelo v United States {supra, at 1111): “[a] federal probation officer is an arm of the court and not an agent of the government qua prosecutor. The probation officer’s role in the sentencing process is not an adversarial one. Rather, he acts as a neutral gatherer of information from many sources to be used by the judge imposing sentence.” Thus, even though a probation officer is a peace officer (CPL 1.20 [33]; 2.10 [24]; People v Ronald W., supra, at 735), when performing a presentence interview she is not an agent of the prosecutor or the police, but rather an arm of the court. It is precisely because of a probation officer’s nonadversarial position that it is unnecessary for her to advise a defendant of his Miranda warnings. Put simply, a presentencing interview is not the type of inherently coercive environment Miranda seeks to protect against.
Further, Miranda warnings were contemplated as a mechanism for providing a defendant with some degree of control in an interrogation environment. (Moran v Burbine, 475 US 412, 426 [1986]; United States v Cortes, supra, at 127; Williams v Chrans, supra, at 951.) In a presentence interview, a defendant is afforded a significant amount of control over the process. Presumably, prior to being interviewed, a defendant has discussed the purpose of the interview and the presentence *185 report in general with his attorney, and has been advised on how to proceed. (See, United States v Cortes, supra, at 127; United States v Rogers, 921 F2d 975, 980 [10th Cir 1990], cert denied 498 US 839.) Nothing in CPL article 390 mandates a defendant’s participation in the presentence process. Additionally, prior to reaching the sentencing phase, a defendant has either pleaded guilty or has been found guilty after trial. In this case, defendant was convicted after a jury trial and it can be inferred that he was already well versed in his Fifth Amendment rights in connection with his decision on whether or not to testify. (See, United States v Rogers, supra, at 980.) Thus, the ability of a defendant to control the presentence interview itself is substantial, and further negates a finding that the presentence interview is inherently coercive and that the protections of Miranda are required.
Also, a review of the specific circumstances surrounding the interview in this case supports a finding that this particular interview did not create an inherently coercive environment. First, Officer Vullo began by explaining the purpose of the interview. She told the defendant that she would be asking him many questions and that he was free to answer those questions, but also that he could choose not to. Defendant was advised at the outset that any statements he did make would be made part of the report and given to the court. Clearly, in comparison to a police interrogation, defendant had a great deal of control over the interview process and was not subjected to any overbearing conduct by Officer Vullo.
Finally, and significantly, the element of interrogation was entirely absent from the presentence interview. Interrogation is defined as express questioning, or its functional equivalent, likely to elicit an incriminating response from a defendant. (People v Ferro, 63 NY2d 316, 322 [1984], cert denied 472 US 1007.) That was not present in this case. Rather, Vullo asked the defendant a routine question about his father’s whereabouts and defendant blurted out that he killed his father. Vullo did not question the defendant any further about his father or about the statements he just made. She did not ask him when this happened, where it happened or how it happened. In fact, she did not ask him anything else about his father. Instead, she continued with the interview according to standard Probation Department procedure. Here, the defendant’s admissions are similar to volunteered statements that have consistently been held not to be the product of interrogation. The restraint Vullo exercised in not asking any follow-up *186 questions lends further support to this conclusion and attests to the lack of interrogation during the interview.
While not controlling, the Federal courts that have considered the issue have consistently held that a defendant is not entitled to Miranda warnings at a postconviction presentence interview. (See, e.g., United States v Cortes, supra; United States v Hicks, 948 F2d 877, 885 [4th Cir 1991]; United States v Rogers, supra; United States v Miller, 910 F2d 1321 [6th Cir 1990], cert denied 498 US 1094; United States v Jackson, 886 F2d 838 [7th Cir 1989]; Baumann v United States, 692 F2d 565, 577 [9th Cir 1982].) The rationale underlying those decisions is that probation officers are neutral information gatherers for the sentencing Judge; the interview is not inherently coercive; and a defendant is not required to speak to a probation officer or aid in the preparation of the presentence report. The analysis applied by the Federal courts is certainly persuasive, and there is no logical reason to believe that the rule should be any different in the State courts.
For all of these reasons, the court finds that the presentence interview did not create an inherently coercive environment and was not the type of custodial interrogation to which the Miranda protections apply. Therefore, Officer Vullo was not required to advise defendant his Miranda warnings prior to speaking to him.
Defendant further argues that use of incriminating statements made to a probation officer violates the rehabilitative nature of the probationary relationship. Defendant reasons that the relationship would be hampered by placing sanctions on a probationer for openly communicating with his probation officer. However, even accepting defendant’s contention, under the facts of this case, the argument simply does not apply. That is so because no probationary relationship existed between the defendant and Officer Vullo at the time of the interview. Simply because the Probation Department is required by statute to conduct presentence interviews, that does not transform presentence interviews into probationary relationships. Vullo acted as an information gatherer for the court, not as a probation officer concerned with the defendant’s rehabilitation. The defendant was not on probation and had not yet even been sentenced. It should also be noted that a sentence of probation was not even an option in this case because, as a predicate felony offender, a State prison sentence was mandatory upon defendant’s conviction of a felony. Therefore, this is not a situation in which any relationship existed between defendant and Officer Vullo.
*187 Defendant also maintains that both the presentence report, and the interview incorporated therein, must remain confidential under CPL 390.50 (1). He argues that to allow Officer Vullo to testify to statements made during the interview would be violative of that statute. The statute provides that a presentence report is confidential and “may not be made available to any person or public or private agency except where specifically required or permitted by statute”. (CPL 390.50 [1] [emphasis added].) Under CPL 390.50 (2), the prosecutor is specifically entitled to a copy of the report. Here, Officer Vullo properly told a prosecutor of the admissions defendant made during the presentence interview. Indeed, in this court’s opinion, the probation officer had no other option but to report that defendant confessed to a murder. (See, Minnesota v Murphy, 465 US 420, 432, supra.) Similarly, as the prosecutor was entitled to see a copy of the presentence report, he was certainly entitled to be made aware of whatever defendant said in the interview used to prepare the report. Upon receipt of this information, the prosecutor was in turn duty bound to investigate the matter. To hold otherwise would mean that a defendant could state in a presentence interview that he committed a totally unrelated crime without fear that the statements could ever be used against him. It should also be noted that there is nothing in the record to indicate that defendant had any expectation that what he said during the interview would remain confidential. As the statements were properly revealed to the prosecutor, I find that the confidentiality provision of CPL 390.50 was not violated and cannot now be asserted as grounds to suppress the defendant’s statement to Officer Vullo.
For all of the above-stated reasons, the statements made by defendant to Probation Officer Vullo will be admitted at his subsequent trial.
Similarly, the court finds that the statements to both sets of detectives were in all respects proper. On October 12, 1995, Detectives Colaianni and Newham and Sergeant Casey went to Fishkill Correctional Facility to speak to the defendant. Although the defendant was clearly in custody, the statements he made are admissible. Statements that are not made in response to police interrogation, or the functional equivalent thereof, are deemed spontaneous in nature and not subject to the protections of Miranda. (Rhode Island v Innis, 446 US 291 [1980]; People v Ferro, 63 NY2d 316, supra; People v Huffman, 61 NY2d 795 [1984]; People v Lynes, 49 NY2d 286, 294 [1980].) *188 When the defendant was brought into the interview room, Detective Colaianni introduced himself and told the defendant that they were investigating his father’s homicide. When they all sat down, the defendant blurted out, “I hear voices. I hear a bang. I shot my father.” This statement was not made in response to any question by the detectives. Nor can Detective Colaianni’s statement as to the purpose of their visit be deemed the functional equivalent of interrogation.' (See, People v Rivers, 56 NY2d 476 [1982]; People v Chambers, 184 AD2d 716 [2d Dept 1992].) Before defendant said anything else, he was properly advised of his constitutional rights. I find that those rights were knowingly, intelligently and voluntarily waived, as evidenced by the signed waiver form. After being advised of his rights, defendant made another unsolicited statement, “I was on the train that day.” This statement is also admissible because it was both spontaneous and it was made after defendant was properly advised of his Miranda warnings. Following that statement, defendant told the detectives he wanted to go back to his cell and the interview was concluded.
The statements the defendant made to Detectives Dana-her and Carter two and a half years later on April 2, 1998, while at Sing Sing Correctional Facility, are also admissible. Again, like during the earlier visit, defendant was properly advised of his constitutional rights which he then knowingly, intelligently and voluntarily waived prior to any questioning by the detectives. Additionally, there was a definite and pronounced break between the visits by the detectives. Because of that, the defendant cannot, persuasively argue that he was under the influence of the initial interview or that the attenuation was insufficient. (See, People v Chapple, 38 NY2d 112, 115 [1975].) However, even if the People were required to demonstrate attenuation, the result would still be the same. First, there was an extremely lengthy interval between the questioning sessions. Much shorter periods have been held satisfactory to establish attenuation. (See, e.g., People v Carreras, 209 AD2d 350 [1st Dept 1994], Iv denied 85 NY2d 907 [24-hour break sufficient to uphold the admissibility of the second statement]; People v Dunkley, 200 AD2d 499 [1st Dept 1994], Iv denied 83 NY2d 871 [one-hour break deemed definite and pronounced].) Additionally, the defendant was properly advised of his Miranda warnings by a different detective at the second interview. (See, People v Hayes, 213 AD2d 193 [1st Dept 1995], Iv denied 86 NY2d 781; People v Nova, 198 AD2d 193, 195 [1st Dept 1993], Iv denied 83 NY2d 808.) This fact together with all the *189 other factors clearly demonstrates sufficient attenuation in this case.
Finally, defendant argues that the statements made to the detectives in both 1995 and 1998 must be suppressed because they were derived from an illegal source, namely the statement to Probation Officer Vullo. In making this “fruit of the poisonous tree” argument (Wong Sun v United States, 371 US 471 [1963]), defendant claims that everything derived from defendant’s initial statements must be suppressed. However, as the court has already found the statements made to Vullo are admissible, the defendant’s later statements to the detectives are simply not the result of any prior illegality.
For the foregoing reasons, all of the statements sought to be introduced into evidence by the People are admissible at trial. The defendant’s motion is denied in its entirety.